at All. Next argument will be in case number 25-1000, Town of Hempstead v. United States at All. Good morning, Your Honor. May it please the Court, I'm Laurel Kretzing, arguing for the appellant, Town of Hempstead. This case basically asks whether a public water supplier that installed an approved treatment plan to keep the drinking water of 50,000 residents safe should have been turned away on a summary judgment motion. It's respectfully submitted that the court below applied the wrong legal standard and made the elemental error on summary judgment of issue deciding rather than issue finding. It's respectfully submitted that . . . Well, if the issue finding by the court results in a determination that no reasonable jury could find otherwise, then that's the end of it, right, and dismissal is appropriate? That is the summary judgment standard, Your Honor, but it's respectfully submitted that the court . . . Well, they have to look at the merits. They have to look at to see what the evidence was. Yes, and it's respectfully submitted that the court erred in deciding that the evidence on a motion was so against the town that there was no issue to be tried. On a motion for summary judgment, disputed issues of fact have to be construed in favor of the non-movement, and the court did that at . . . consistently all the way through the case. Well, why don't we start with the standard then? I mean, you're arguing for a relaxed causation standard, and I'm trying to understand what that means here and how we would decide that on summary judgment. So what is a plausible migration pathway? What does that require at summary judgment? Because plausible sounds . . . I understand what that means in the motion-dismiss context, where you just have to plead something that sounds plausible. Summary judgment, there's still an evidentiary requirement, right? There's still an evidentiary requirement, but on this record, the town met that evidentiary requirement. If you start from the beginning, the public water supply plan that was a part of the DEC ROD set out a standard with respect to the migration and put in the monitoring wells to determine whether a treatment plan was appropriate. Can I just . . . I'm sorry to interrupt what you were going to, but actually just to follow up on what Judge Park was saying, specifically on this issue of causation, it's not clear to me what you're saying the standard is. What did you have to establish to get past this? What causation is relevant? Is your view that what you have to show is a plausible migration path and that that is sufficient, or is it something more than that, or less? What is the causation standard here? To establish causation in a CERCLA case, you have to show that the contaminant in question was disposed of or on defendant's property, and on a two-site case, you have to show that the same pollutant or contaminant showed up on the second site, on the town's site. That's not necessarily true, right? It has to be tied to the source in order to show causation. It's not just the existence of a toxicity on there, because there could be some other source of toxicity. There could be some other source of toxicity, but that leads into what the plausible standard has to be. Right. But causation is more than the possibility of causation, isn't it? Yes, it's more than the possibility, but we're not charged with proving it more probable than not. It's just showing that the way the plume was going, the plumes from the ... Why aren't you ... Why isn't the standard more plausible than not for causation? It is for causation generally, the comments or the evidence. Well, that ... You go back to the fundamental purpose of CERCLA, which was to clean up contaminated property without looking ... CERCLA speaks of causation, not like standards or lesser standards or worse standards or anything. That's what ... It uses the term causation, right? Well, with respect to the one-site property, all you have to show is that the chemical was disposed of and that's it for liability.  Because that's one site. Causation is almost per se in that kind of situation. It is. It's a two-site, three-mile difference between the site, the original site of the origin that you're claiming and the wells. Well, that's correct, but really the undisputed evidence in the record shows that the plume has expanded, that the original Hooker Rooker plume and the Navy Grumman plume merged together and it spread southward through Long Island. There's testimony in the case that contradicted that in the sense that the toxicity was flowed from north to southwest, I think, is what I recall. Right. There's testimony that the general direction of the plume is south-southeast. Yeah. And our wells are south and slightly west. But generally, it's not always. And, you know, the maps... Well, you've got to prove that, but you're trying to draw a different inference than what the testimony established. Correct? I mean, just, well, it's a plume, therefore we're not going to necessarily be bound by south-to-southeast determination. Correct? Well, that's correct. It's irregular on sides and the DEC has prepared mapping and... Let me try to ask a little bit more squarely. If groundwater flow is southeast and the wells were southwest, how is it a plausible pathway? Well, again, going back, it's generally south-to-southwest. That doesn't mean it's always south-to-southeast. And in the record, a map of the plume prepared originally by the DEC, and I note that the covestro defendants expert included the map with the wells at 9172 of the record, and it shows well 7A and 8A on the very periphery of the plume and well 13 in the plume. So it's not the most toxic part of the plume, but it's plausible that the toxins or the VOCs in the plume were drawn into the town's wells. Now, why would the toxin TCE was one that was found at both sites, but why would that be found there and not Freon 113 if that was actually the main contaminant, at least the naval weapons? All right. Well, there's evidence in the record that indicates that there's a pure strain of 113 that could have come from the western edge of the Navy Grumman plume where it was used. There was substantial evidence that they did use it and they disposed of it improperly or they disposed of it in the ground properly or not. Okay. So I guess could have come from, what does that mean in what you just said? It means that there was not to use the plausible pathway, but there was a way for Freon from the defendant's site to make its way into the well of the Levittown Water District, the well 113. What do you do with the National Contingency Plan here, which was never followed, not even known by the officer in question? It seems to me that there would have been consultation. There would have been, we would have discussed this with the ultimate, whom you claim to be the ultimate sources. There would have been some discussion about the degree of remediation that would have occurred and whether it was appropriate for this particular problem or whether it was too much and therefore it shouldn't be undertaken because even if there was causation, you paid too much and they should have been consulted on that. There's aspects of that. I don't know what the effect of failure to comply with the National Contingency Plan is, whether it precludes you from bringing a case or whether it's just a factor to be taken into account somehow. Well, respectfully, Your Honor. That's a good question. I mean, I'm sort of asking for a mini-essay from you. But how, doesn't it matter that the National Contingency Plan was not followed? I think in this case it does not, but I want to back right up and say it was followed in this case because, again, referring to the Public Water Supply Contingency Plan, that came out of the DEC's rod with respect to what remedial action the Navy Grumman defendants had to take. But what's the support that that is sufficient to qualify as substantial compliance with the NCP? Well, the rod itself had public hearings, was the result of years of study. Right, but your client was not a party to that. No, my client was not a party to it, but it was a beneficiary of the Public Water Supply Contingency Plan that was part of the rod. As to all three wells? I would submit yes, as to all three wells. The fact that only 113 was identified specifically in the PWSCP doesn't change the fact that the Navy was recognizing that public water supplies was going to be affected by what happened here. What you're saying sounds very imprecise to me. The idea that substantial compliance with the NCP can be found as a result of the letters for this contract that was set out to address the flumes that the town was not a party to, that did not specifically reference, I guess it referenced maybe one of the three wells at issue? All of this does not sound like substantial compliance to me. Well, the Public Water Supply Contingency Plan put in a plan for how water treatment, public water facilities would obtain reimbursement for their costs, and it didn't reference the need to do anything else. One thing at the beginning of it, I think the district court failed to capture sort of the essence of the Public Water Supply Contingency Plan because it started with this process would not preclude the water districts from taking any action that they deem appropriate. It's all based on these trigger values. When the trigger value was hit, then it contemplated that there would be consultation, but it doesn't lay out a step-by-step process. There was no requirement that the town submit a plain type document. In fact, back in 2012, the trigger value was hit, and the Navy in Grumman conveyed that information. In 2013, the town contacted the DEC, who forwarded that contact to Navy in Grumman, and the contact from the town's contractor was, we have VOCs in our wells, and we need information from you to prepare a treatment plan. What does any of this have to do with the NCP? I mean, I thought there's a requirement that town has to do an investigation about how to remediate the pollutants, and it has to do a feasibility study, it has to do a cost-benefit analysis, that kind of thing. And the town witnesses said they didn't even know what the NCP required. So I guess I'm not following how your argument is saying that you, how you're establishing that you complied with the NCP anyway. The town complied with the NCP by following what they had to do under the Public Water Supply Contingency Plan, and they did do a feasibility study. It wasn't shared with Grumman or Northrop or anybody. It was shared after they had already started. So at that point, they're going to share in the cost, and so they have some awareness and input into the process, and that seems like it wasn't followed. Is that fair? That's a fair statement. That's a fair statement. I guess what you're saying is they weren't prejudiced by the fact that the plan was not followed because the other, you know, the prior process was undertaken. Is that what you're saying? Yes, Your Honor. And to the extent that there was any obligation to engage, that obligation was a two-way street. The town reached out. They never had any input. I mean, it's a little of your characterization of it. I mean, you're saying the town reached out after it had already gotten the design approved and started work and said, hey, this is what we're doing, when the, I guess it was the Navy, responded with questions, the town filed a lawsuit. I mean, that's, I'm not sure that your characterization of, well, they had a duty to negotiate with us, when you were the ones who knew that there was something to be negotiated, and you started the negotiation, if you want to call it that, after you'd already taken these steps. Actually, the process of the reach-out started when the town reached out to the Navy. It started even before that, when the Navy and Grumman notified the town that the trigger value had been reached. But that notification didn't come with any, hey, we need to have a meeting and sit down and see what's going to be done about this. When the town reached out in 2013, there was no reach back that we need to discuss this and come up with a joint plan. Right, but when the town formally notified them and sent a letter and said, this is what's going on, this is how we're addressing this, this is what we want, they didn't respond to that letter, and the town did not respond back, correct? The response to the letter was, this didn't come from us, and send us all of this data to whom? Right, and there was no response. It wasn't even like, we don't have to respond, we didn't think this information's not available, we're doing this, we're doing that. There was no response to that letter, correct? Yes, that's correct. There was no response to that letter. The town, as they testified, took that as a no. Took the Navy's letter as no, we're not. Took their letter saying, hey, do you want more information? Provide us this, provide us that. The town took that as a no and went forward. Well, because of the nature, the vast majority of the information that was requested was water flow data, data that the Navy and Grumman already had in their possession or would have been expensive for the town to produce. The town focused on what its basic charge, or the water district's basic charge, is to provide clean water for its residents and to make sure its wells are not put down for an extended period of time. So, in that sense, I go back to the beginning of the Public Water Supply Contingency Plan where it says, you know, nothing herein stops the town from doing anything it has to do because it is charged with providing contamination-free water to its residents. It doesn't have the luxury of sitting around and waiting for someone to say, oh, yes, we're going to pay you and we want to engage on what kind of treatment plan you're going to put in. That's why it's so important, the contingency plan, we follow it, because all these problems can be worked out in advance, a lot of them, anyway. It can be determined what's an appropriate remediation and how the plan will, how the investigation will continue and there'll be information shared by the parties before, even before any lawsuit. So, you know, that's the problem. I'm just wondering why, maybe you can answer this, why the case should go any further in your direction if you didn't comply with the National Contingency Plan. Why isn't that a prerequisite? Failure to exhaust. It's our position that by, that the... I know it's your position that somehow what was done satisfied parts of the National Contingency Plan, but that's different from the process. You know, 90% of our cases deal with process as an appropriate process. Here there was not. Well, I think the appropriate process in all material respects was already satisfied by the ROD and the implementation of the Public Water Supply Contingency Plan. With respect to, you know, it was, it contemplated... I understand what your argument is. You said this a minute ago. Okay. You've reserved some time for rebuttal. Thank you. Thank you. Okay, we'll hear from the defendants. First up is Mr. Miller. May it please the Court, my name is Mark Miller, Counsel for the North of Grumman Appalese. Just so the Court knows, I will be addressing the town's causal evidence under Circle 107. Mr. Schumacher, on behalf of the government, will be addressing the necessary and NCP consistency problems of the town's claims. Mr. Amoroso will be addressing the district court's decision to dismiss the tort claims. And then they'll also, Mr. Amoroso and Mr. McDonald will also address the Hooker-Rucco site-specific instances. Your Honors, there are two volatile organic compounds that are at issue in this case. The first one is trichloroethylene, or TCE. After decades of investigation overseen by the regulator in this matter, New York State Department of Environmental Conservation, they have determined that TCE is far and away the most predominant contaminant in the plumes coming from the legacy Navy Grumman site. The second contaminant is ferrion-113. Ferrion-113 is a very minor component of the plumes, and everywhere in the plumes that ferrion-113 is located, TCE is also located, is co-located with it in much, much higher concentrations, upwards of 90 to 95%. Ferrion-113 is the substance that is in the town's wells that sparked this lawsuit. But unlike what we're seeing in the plumes, the pattern is completely different in the town's wells. The town's wells consist of almost entirely ferrion-113 and consist of almost no TCE. If the town's wells were being impacted by the plume, there would be TCE there, and the fact that it's not renders the town's causal arguments implausible. The district court, therefore, found that the town's evidence of causation on its 107 claim was speculative, unreliable, and therefore the town could not raise a genuine issue of disputed material fact for purposes of showing that its response costs were caused by a release of ferrion-113 from the site. And what's your view on what the causation standard is? Yes, Your Honor. So obviously this is a two-side case, and this court has not spoken specifically to what standard applies in a two-side case. However, I think this court's precedent in other CERCLA cases sets forth a framework, if you will, for what standard should apply. Starting with this court's, I believe it's 1992 opinion in General Electric v. Amco, the court stated that in CERCLA cases there has to be a nexus to the defendant's release and the response cost. Jumping forward, if you will, in the DBL— That's pretty broad, a nexus. How much of a nexus? That would allow de minimis causation. What about just causation as we understand it? There are no other causes, or it caused it. In other words, why are we searching, or why are the parties suggesting standards that are different from normal tort causation? Well, Your Honor, I think the parties are arguing over causal standards because the goal of CERCLA is a little different than tort law. And to get to the meat of what I think you're asking is, if we look at this court's DBL opinion, DBL v. Niagara-Mohawk in 2012, this court affirmed a trial court opinion in a CERCLA matter where there was no evidence that the contaminants on the defendant's site traveled to the plaintiff's site. And what the court stated was, in the absence of less speculative direct or circumstantial evidence, or admissible expert testimony linking the release at the defendant's site to the plaintiff's incurrence of response cost, then the plaintiff cannot raise a genuine issue of disputed material fact for purposes of summary judgment. I think that standard, Your Honor, that standard can be applied from this court's own precedent. It doesn't have to go to other circuits to find a plausible migration pathway. It's flexible enough to account for many different circumstances. Let's assume for a second that we use a plausible migration pathway standard. Is your argument that even that is not satisfied because the TCE would have gone the same way that the free N-113 did, even under the Towns theory? Yes, Your Honor. Okay. Thank you again. Yes, Your Honor. Even in the plausible migration cases, specifically a SARCO versus CEMEX, which I think the Town cited in its brief, it stated that a speculative pathway is not a plausible pathway. And I think that's exactly what we have here. The Town has made several different arguments about its experts of a capture zone analysis, a void theory, ground water flow goes in this way as opposed to that way, and our wells are located within the plume. We've argued in our briefs why those don't make sense. But even if we assume for the sake of argument that what the Town is saying is true, then the plume, if their wells were being impacted by the plume, you would see TCE in their wells. And that is just not what the evidence, not what the... Do you think that's as... What about the argument, certainly leaving TCP out of the southeast-southwest discrepancy? Is that sufficient? I don't think so, Your Honor, because, one, it's not supported by actual data. DEC has said that regional ground water flow goes from the south to the southeast away from the Town's wells. And even so, if it were true that that was happening and the plume was going towards the Town wells, you would see TCE in their wells, but that's not what we're seeing. So the argument is speculative at best. It's an argument, but whatever the argument is, it's completely obliterated by your larger TCP argument. I'm sorry, Your Honor? It's obliterated. That argument falls away because of the absence of the TCP. Yes, Your Honor. I see my time is up, unless the bench has any other questions. I have a question, although I don't know. Perhaps it's under the umbrella of one of your colleagues, but I'd like someone to address the question of the dismissal of the state common law claims. Mr. Armaso will address that, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Robert Schumacher from the U.S. Attorney's Office for the Eastern District of New York for the Department of the Navy. As counsel indicated, I'm going to try to address some of the questions that came up with regard to the national contingency plan arguments that were raised. I know, Your Honor, one of the questions that was raised during the town's argument was, what is the effect of not complying with the NCP? Well, I think the law is clear that to establish a prima facie case under CERCLA, you have to show compliance with the requirements of the NCP. So the inability to show that compliance with the requirements of the NCP precludes them from recovering the cost of the response from any of the alleged responsible parties under CERCLA. And as some of the questions indicated, the record strongly supports, obviously, that the NCP was not followed. I'm not sure if the town is actually even arguing that they were. As you indicated, there were some admissions by the town water commissioner indicating they didn't follow it, indicating they didn't know what the requirements were. As if those weren't damning enough, I know that one of the experts in the record, an NCP compliance expert, laid out 26 requirements or something along those lines in order to follow the NCP, and the town simply followed one of them. So if we agree that the town failed to follow the NCP, is that enough to affirm, do we then not need to reach the causation question that your friend just addressed? Absolutely, Your Honor. It is. I know some of the argument from the town was essentially, even though we didn't know what the NCP was, even though we didn't try to comply with it, we should, what the town says, be exempt nonetheless from having to comply based on some of our Monday morning quarterback actions. There were some questions about whether or not by following the public water supply contingency plan, whether or not that equals NCP compliance. To be clear, and I think the district court got this one right, they didn't follow the public water supply contingency plan. So you really don't necessarily need to reach a legal question about where there may be authority for that sort of legal argument because the facts in the record of this case show that there's a process under the PWSCP to be followed, which specifically contemplates pre-design negotiations before a remedy is started or construction started or anything to that effect. As the court asked these questions, what we know is they designed and demanded. They presented, not only designed and demanded, they started construction on one of the well's remedies, well 13, presented the Navy with a demand and said, here's what we're doing, pay for it. That's not compliance with the PWSCP, and by opting out of the PWSCP compliance, they sued under surplus so then they must therefore show NCP compliance, and they simply did not do so as the record reflects and as the district court got it right. With that, if the court has any questions for the Navy specifically, I'm happy to entertain them. Thank you, counsel. Thank you very much. Good morning, Your Honors. Joseph Amoroso, law firm Skank Price Smith and King, on behalf of Covestro LLC and Bayer Corporation. I'm going to quickly discuss the Hooker-Ruckels site, and then I'm going to jump to Your Honors' questions regarding the common law claims. So as acknowledged previously, this is not a one-site case. The Bayer and Covestro defendants in this case are named solely due to their involvement with the Hooker-Ruckels site. The Hooker-Ruckels site is a separate industrial site with a separate historical ownership, operations, and contaminants. To prevail, plaintiffs must show that a release or a threatened release from the Hooker-Ruckels site in particular resulted in plaintiffs' incurrence of response costs. We believe we prevail under any test, under any standard. The only contaminant leaving the Hooker-Ruckels site is vinyl chloride, which the U.S. EPA has determined is being adequately addressed and adequately remediated by the off-site treatment system. Vinyl chloride is not a contaminant associated with the Levittown wells. This is not a case of a shared plume because the contaminants don't get beyond the treatment system. The contaminant that plaintiff is addressing is Freon 113. There's no evidence that Freon 13 was ever used, released, detected, or migrated from the Hooker-Ruckels site. Let me jump quickly to state law claims because I know Your Honor is interested in those. The state law claims in this case were fully briefed below. Plaintiff had full notice and the issues were briefed in full. If plaintiff thought that it was improper, it should have raised the issue at that time, not on appeal. That argument, I believe, is now waived. Furthermore, with respect to supplemental jurisdiction, plaintiff waived any challenge to supplemental jurisdiction because it failed to raise or brief the issue below. But in any event, even absent a waiver, the district court properly exercised its discretion. You can't say it's an abuse of discretion where the court decided causation and under the same facts for CERCLA and the New York Common Law, if anything, the New York Common Law is a- I think you're about to answer what I was going to ask you, whether or not the causation standard is the same with regard to all the common law claims as here. Correct, Your Honor. So under the New York Common Law, it's in fact a stricter standard than the strict liability standard of CERCLA. Plaintiff would need to show more in terms of causation. So if you can't meet the CERCLA standard, you most certainly can't meet the more stringent common law standards. With respect to the Hukou Ruko site, plaintiffs conducted and plaintiff's experts conducted no analysis at all with respect to our site. They omitted as such. What we have is 40 years of investigation, sampling, and review by NYPDC and the U.S. EPA, which have confirmed the absence of any freon at that site and have confirmed that the remedy, the off-site remedy, is working and is preventing the migration of contaminants. I have nothing further, Your Honor. Unless you have questions. Thank you, Counsel. Thank you. And last up is Mr. McDonald. Good morning. May it please the Court. Christopher McDonald, Whiteman, Osterman, and Hanna for Environmental Resource Holding, LLC, formerly known and sued herein as Occidental Chemical Corporation. I'm going last, so some of these guys have stolen my thunder on a couple of these arguments. But I do want to talk mostly about fate and transport issues as they relate to the Hukou Ruko site. And if you talk about fate and transport, you need to talk about the questions that the Court raised with respect to causation. And so if you look at the briefing from the town on this appeal, they can see at least some level of causation is required. And we agree with them. Causation is right in the statute. If you look at 9607A, the phrase, which causes, is in the statute. It's also in the Second Circuit case law. Where we disagree is on sort of the precise articulation of that standard. So Occidental and the other defendants used phrases like substantial factor, clear connection, causal nexus. For its part, the town uses slightly different language and, as the Court pointed out, a more relaxed standard. So they used phrases like minimal causal nexus, plausible migration pathway. Ultimately, though, even if this Court were to adopt a more relaxed standard, it should still affirm the district court's grant of summary judgment. Because the town can't meet its own standard. If you look at page 20 of their brief, the town sets forth a three-pronged test for what it claims to be the causal standard for its circle claim. They say that they need to show, A, that there's a contaminant in their wells. B, that there's a same or chemically similar contaminant at the site. And C, that there's this plausible migration pathway from the sites to the wells. They fail on elements B and C of that analysis. And that's because there are two critical undisputed facts in this case. Freon 113, which is the primary driver of the remediation efforts by the town at the wells, is not a contaminant of concern for the Hocorucco site. More importantly, vinyl chloride, which is the primary contaminant of concern for the Hocorucco site, was not found in the wells. So it's a very similar argument to the one that Mr. Miller made at the beginning. If there is not vinyl chloride found in the wells, then the Freon 113 and other contaminants in the wells came from somewhere else. There's some evidence, is there not, of the existence of other possible sources of Freon 113? The town cites three somewhat random references in the historical records, business records of Occidental, to try to say that Freon 113, even though not a contaminant of concern, was at the site and discharged at the site. I think the district court does a very good job of explaining why those three references are inadequate to defeat summary judgment. But at some level, it's almost a red herring. Because they still have no answer for the absence of vinyl chloride. So even if you were to assume, for the sake of argument, that there was a question of fact as to whether or not Freon 113 was present at the site and released at the site, and even if you were to assume, additionally for the sake of argument, that contaminants from the Hocorucco site had enough time and the proper hydrogeological conditions to reach the wells, you still have to account for the lack of vinyl chloride in those wells. This is your version of the TC argument. Absolutely, 100%. And the only real proof in the record on this point comes from Occidental's expert, Dr. Jeffrey Johnson. And he says, in part and in part, that the downgrading extent of the vinyl chloride plume delineates the southern boundary of the Hocorucco groundwater contamination. So what does that mean? It means that if stuff was coming from the Hocorucco site and getting into the wells, you would see vinyl chloride. And the fact that there isn't vinyl chloride means whatever's there is not from Hocorucco. Unless there are any other questions, we rest on our brief. Thank you, counsel. Thank you. We'll hear from you.  Just a couple quick points. With respect to the Hocorucco site, while the testing shows that the chemicals are not currently being released from the site, the Hocorucco site is a much older site. And the evidence in the record, our expert opined that chemicals from that site left the site many years ago and migrated it to the town wells. And I would note that PCE is one of the chemicals that were produced by the Hocorucco site and the Navy site. And that is present in the town's 7A well. And with respect to the lack of TCE and the lack of vinyl chloride, it's our position that we're not required to, the cases say that we're not required to show an exact chemical fingerprint, just that the VOC on our property. Under your standard, doesn't that go to whether your migration pathway is plausible? What's the explanation that you could give to make it plausible that one chemical made it from the site to the wells and the other didn't? Well, the explanation with respect to the Freon 113 is that there's a separate clue. I understand that. Yes. Between the TCE and the PCE. The TCE or the PCE, the explanation coming from Hocorucco is that had migrated off site many years ago. And is there evidence for that in the record? I believe our expert opined that that was possible. Possible. Okay. And just with respect to the state law claims, I would respectfully submit that this was Phase 1, the federal claims. Phase 2 in discovery and on the motions were not, or rather, there was no Phase 2 discovery, and there was no permission to entertain the state law claims on the summary judgment. Therefore, the town had no notice. If there had been a Phase 2 discovery, what type of information would you be seeking in furtherance of the state law claims? What more would you be looking at? Well, it would be, you know, basically it would be the same type of information, but it would be, you know, applied to trespass and public nuisance. And in that sense, the elements of those causes of action and the elements of a state law negligence claim are different. And under state law, standards would be evaluated differently. Thank you, counsel. Thank you all. Thank you, Your Honors. We'll take the case under advisement. And that concludes our arguments for today, so I'll ask the Courtroom Deputy to adjourn.